IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

CURTIS CRAFT                                                    PLAINTIFF

   v.                          Civ. No. 07-6002

OUACHITA TECHNICAL COLLEGE;
DR. BARRY J. BALLARD, in his individual
and official capacity as President of
Ouachita Technical College;
DR. BLAKE ROBERTSON, in his individual
and official capacity as Vice President of
Adult and Workforce Services at Ouachita
Technical College; and BOARD OF TRUSTEES
FOR OUACHITA TECHNICAL COLLEGE                                  DEFENDANTS

**MEMORANDUM OPINION**

On May 8, 2007, Plaintiff filed his Amended Complaint seeking recovery pursuant to 42 U.S.C. § 2000e *et. seq.* ("Title VII") and 42 U.S.C. § 1983. Plaintiff alleges that Defendants discriminated against him based on his race and that he was terminated in retaliation for filing an internal grievance. Currently before the Court are Defendants' Motion for Summary Judgment (Doc. 37) filed September 16, 2008; Plaintiff's Response (Doc. 48) filed October 12, 2008; Defendants' Reply to Plaintiff's Response (Doc. 52) filed October 15, 2008; and other related documents. (Docs. 36, 38, 47, 49, & 50). For the reasons recited herein, Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's claims are DISMISSED WITH PREJUDICE.

1

## I.   Background

In determining whether summary judgment is appropriate, a court must view the facts and inferences in the light most favorable to the non-moving party. *See*, *Rabushka v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997). The following facts are undisputed except where otherwise noted.

1. Curtis Craft, an African American male, was hired as the Administrator of the newly-established Career Pathways program at Ouachita Technical College ("OTC") in August 2005.
2. Craft was not the only applicant for the position.
3. The Career Pathways program was designed to assist single parents in the pursuit of education and employment.
4. Craft was interviewed for the administrator position by a three-person committee which included Dr. Blake Robertson, the Vice President of Workforce Services at OTC.
5. Thereafter, Dr. Robertson recommended to Dr. Barry Ballard, President of OTC, that Craft be hired.
6. Dr. Ballard accepted the recommendation of Dr. Robertson. Dr. Ballard then recommended Craft to the OTC Board of Trustees, which approved Craft for the position.
7. Craft understood his role as Administrator to be "doing whatever we needed to do to get the required or the desired number of applicants to [] sign up for the program [], and

then after that to manage those applicants, guide them and support them as they pursued their academic careers or academic learning ventures."

8. Because his position was newly-created, many of the particulars of Craft's duties were not well defined.

9. Craft received position training from the Arkansas Department of Higher Education ("ADHE").

10. In his position, Craft bore ultimate responsibility for the production of monthly and quarterly statistical reports to be made to Mark Lane of the ADHE.[1]  The reports included tracking information and information regarding the number of participants.

11. In his position, Craft was a member of the hiring committee which hired Career Pathways staff members.

12. Craft participated in the decision to hire Billy Frances, an African American male, as a counselor.

13. Following Craft's hire, Dr. Robertson had suggested to Craft that he perform business calls. During these calls, Craft was to contact area businesses and inform them about the Career Pathways program.  However, because Craft was uncertain as to what was to transpire during these calls and because he had received limited training on how to

---

[1] While some dispute exists as to whether Craft needed to personally prepare the reports or whether he was responsible for oversight of the preparation process, it is undisputed that ultimate responsibility for the reporting rested with him.

3

conduct them, he performed only a limited number when he had an expectation as to their probable outcome.

14. Dr. Ballard was aware of problems regarding Craft's deficient performance at least as early as January 2006.

15. Dr. Robertson observed that Craft had difficulty properly controlling and conducting his staff meetings.

16. Dr. Robertson had brought Craft's deficient job performance to the attention of Dr. Ballard prior to February 20, 2006.

17. Career Pathways employee Frances questioned Craft's ability to lead the program and generally viewed him as a "crappy" boss.

18. Frances observed that Craft was never around the office, could not answer staff questions, and did not assist with ADHE reporting.

19. On February 9, 2006, Craft and Dr. Robertson had email communication regarding Dr. Robertson's desire to see Craft make business visits in the surrounding area in order to promote the program.

20. On February 16, 2006, Mark Lane of the ADHE sent Craft a manual and disk with information regarding reporting on the Career Pathways program and establishing a database.

21. Craft lacked the computer skills required to complete the database.

22. On Friday, February 17, 2006, during a meeting which

4

included the Career Pathways staff and OTC administrators, Debbie Goens—a Career Pathways instructor—stated that Craft had not provided information to her or other staff members about admission requirements and segmented classes.

23. In response, Craft sent an email to the meeting's attendees in an effort to refute Goens's charge.

24. Dr. Robertson categorized Craft's response as one of the most unprofessional acts he had ever seen and requested a meeting with Craft on Monday, February 20, 2006.

25. At this meeting, Dr. Robertson provided Craft with a memorandum outlining areas in which he had to improve his job performance and set out specific grievances.

26. Neither the meeting nor the memorandum addressed Craft's email, the initial catalyst for the meeting.

27. Rather, the memorandum insisted that Craft improve his professionalism, that he stop constantly arguing with his supervisors regarding their requests, that he cease confrontational behavior during meetings, and that he make decisions and pursue efforts which keep the program current with its needs.

28. The memorandum gave Craft until the end of March to improve his work performance.

29. Craft was upset by the presence of OTC Human Resources Administrator Rhonda Smith at the meeting. This was

5

perceived as an indication of disciplinary action.

30. Email communication between Craft and Dr. Robertson on February 23, 2006 informed Craft that administration expected him to make business calls.

31. On February 23, 2006, Craft utilized the college's internal grievance procedure in order to grieve the February 20, 2006 memorandum.

32. Craft filed the grievance because he perceived the February 20 memorandum as unfair and because Smith was present at the meeting.

33. A hearing to address the grievance was held on March 1, 2006.

34. At no point in this process did Craft indicate any belief that either the actions of Dr. Robertson or the memorandum were racially motivated.

35. The result of the grievance procedure was a memorandum dated March 2, 2006 produced by Dr. Ballard which addressed Craft's complaint.

36. Of particular importance, the memorandum set out concerns regarding staff morale, Craft's confrontational style, and excessive delegation of work. The memorandum also made clear that Craft was required to make business calls and that he had responsibility for all ADHE statistical reporting.

37. The memorandum again made clear that improvement was required by the end of March.

38. Craft found Dr. Ballard's response satisfactory.

39. On March 9, 2006, Dr. Robertson and Craft met and further discussed ways that Craft could improve his job performance. These included conducting business calls and assisting the Career Pathway's staff on a daily basis. Craft again acknowledged his responsibly for ADHE reporting.

40. Between February 20, 2006 and March 31, 2006, Craft stated that he performed "very few" business calls, making five telephone calls after a job fair on March 2, 2006.

41. The February and March ADHE reports had to be redone because Craft could not correctly enter the data into the database.

42. On April 5, 2006, Dr. Robertson sent Dr. Ballard a memo stating the reasons that Craft should be dismissed from employment at OTC. In particular, the letter noted problems that Craft and his staff were having regarding the ADHE reporting requirements.

43. On April 7, 2006, Dr. Robertson sent Craft a letter informing Craft of his termination. The letter noted that Craft had not improved his job performance between March 2, 2006 and April 7, 2006. It further noted problems relating

7

to staff management and complying with the ADHE reporting requirements.

44. On April 14, 2006, Dr. Ballard conducted a hearing in order to address Craft's requested review of Dr. Robertson's decision to terminate him.

45. Prior to this hearing, Craft was not provided with all the correspondence between Drs. Ballard and Robertson regarding his termination.[2]

46. On April 18, 2006, Craft sent an email to his staff stating "Starting with the first day of working on the database for Mark, March 20th, please explain the events that slowed the process down to one computer and why.  Please include what you were told and by whom regarding why the computers at the Career Pathway's classroom could not be networked.  Indicate when and how the situation got resolved.  Mention any discussions with Mark Lane . . . I might have to go before the OTC Board of Directors to explain what went wrong."

47. On April 20, 2006, the EEOC sent a notice of discrimination to Rhonda Smith, listing race and retaliation as the bases for the alleged discrimination.  Craft had filed his EEOC complaint on April 7, 2006, the date of his discharge.

---

[2] There is no correspondence which in any way identifies race as a potential factor in the decision to terminate Craft.

48. On April 20, 2006, Dr. Ballard sent Craft a letter stating that the termination would stand.

49. On April 27, 2006, Dr. Robertson sent Dr. Ballard a letter restating Dr. Robertson's reasons for terminating Craft. These included Craft's confrontational style with staff and administration—including that related to his failure to make business calls—and problems relating to the ADHE reporting.

50. Also on April 27, 2006, Dr. Ballard sent a memorandum to the OTC Board of Trustees informing them that Craft requested review of his termination. The memorandum set out the chronology and reasons for Craft's termination in a manner consistent with the correspondence previously discussed.

51. The OTC Board of Trustees affirmed this decision.

52. At no point during Craft's employment did he inform Drs. Ballard or Robertson of staff or employment problems that may have existed due to his race.[3]

53. Craft was replaced as administrator by Billy Frances.

**II. Summary Judgment Standard**

In determining whether summary judgment is appropriate, the facts and inferences from the facts are viewed in the light most

---

[3] While there is evidence of tension between Craft and his subordinate employee, Debbie Goens, there is no evidence—beyond Craft's speculation—of a racial component to this tension.

favorable to the non-moving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l. Bank of Commerce of El Dorado, Arkansas v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999).

Once the moving party demonstrates that the record does not disclose a genuine dispute of material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. *Fed R. Civ. P. 56(e)*. The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. 317, 322 (1986).

If the plaintiff fails to make a showing sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial, then the defendant is entitled to judgment as a matter of law and all other facts are rendered immaterial. *See*, *Thelma D. By Delores*

*A. v. Bd. of Educ.*, 934 F.2d 929, 932 (8th Cir. 1991).

### III. Analysis

#### A. Racial Discrimination

To establish a prima facie case of discrimination under either Title VII or 42 U.S.C. § 1983, a plaintiff must prove that: (1) he or she is a member of a protected class; (2) he or she was meeting the legitimate expectations as to his or her duties; (3) he or she suffered an adverse employment action; and (4) similarly situated employees, who were not members of the protected group, were treated differently. *Gilooly v. Missouri Dept. of Health and Senior Services,* 421 F.3d 734, 738-39 (8th Cir. 2005) (quoting *Jacob-Mua v. Veneman,* 289 F.3d 517, 521-22 (8th Cir. 2002)).

Once a plaintiff has established a prima facie case, the employer has the burden of explaining its actions with legitimate, nondiscriminatory reasons.  If the employer puts forth legitimate reasons for its actions, the burden shifts back to the plaintiff to show that the employer's stated reasons were a pretext for discrimination.  *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993); *Chock v. Northwest Airlines, Inc.*, 113 F.3d 861, 863 (8th Cir. 1997).  Plaintiff "must do more than simply create a factual dispute as to the issue of pretext; she must offer sufficient evidence for a reasonable

11

trier of fact to infer discrimination." *Matthews v. Trilogy Communications, Inc.*, 143 F.3d 1160, 1165 (8th Cir. 1998). Plaintiff must show that the stated reason for termination is unworthy of credence and is merely a pretext for intentional discrimination. *Harvey v. Anheuser-Bush, Inc.*, 38 F.3d 968, 971 (8th Cir. 1994).

For the purposes of Defendants' motion, the Court will assume that Plaintiff can make a *prima facie* case. Thus, the Defendants bear the burden of articulating a legitimate, nondiscriminatory reason for terminating Plaintiff. Plaintiff was put on notice as of his February 20, 2006 meeting with Dr. Robertson that dissatisfaction had developed regarding his job performance. In Dr. Ballard's memorandum of March 2, 2006, Plaintiff was given specific recommendations as to what he had to do in order to improve his job performance and maintain employment. Irrespective of what duties Plaintiff believed his job did or did not entail prior to March 2, 2006, it cannot be disputed that after that date, he was required to make business calls, meet all ADHE reporting requirements, and improve the morale of—and his interaction with—his staff.[4] *Rose-Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1108 (8th Cir. 1998)

---

[4] It is clear that Plaintiff was responsible for ADHE reporting from the inception of the Career Pathways program. Further, it is clear that at least as of February 2006, Dr. Robertson expected Plaintiff to perform business calls and business visits. However, if any sort of issue could have existed regarding Plaintiff's knowledge of his duties, it was clearly resolved by the March 2, 2006 memorandum.

12

(stating that "employer's failure to inform an employee of what is expected of her is not evidence of discriminatory animus."). Finally, in his March 9, 2006 meeting with Dr. Robertson, Plaintiff was given further instructions on how he could remedy his perceived deficient performance. Again, Plaintiff was told to conduct business calls and provide more assistance to the Career Pathways staff. Plaintiff expressly acknowledged his responsibly for ADHE reporting.

Plaintiff did not improve to the satisfaction of Drs. Robertson and Ballard. The undisputed evidence indicates that Plaintiff performed approximately five business calls after March 2, 2006. The evidence also shows that Plaintiff lacked the ability to properly generate statistical reports based on the ADHE database system. Confirmation of his general lack of knowledge regarding the database system is provided by his April 18, 2006 email to his staff. "Title VII prohibits intentional discrimination based on certain, discreet classifications; it does not prohibit employment decisions based on other factors, such as job performance, erroneous evaluations, personality conflicts, or even unsound business practices." *Rose-Maston*, 133 F.3d at 1109. In citing to low staff morale, the failure to make a sufficient number of business calls, perceived failure to meet ADHE reporting requirements, and overall deficient leadership; Defendants articulated legitimate, non-

13

discriminatory reasons for Plaintiff's termination.

Plaintiff must demonstrate that Defendants' stated reasons for his termination are merely pretext for discrimination. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999). "[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995). Plaintiff has come forth with no evidence indicating that Dr. Ballard, Dr. Robertson, or the OTC Board of Trustees harbored any sort of racial animosity toward him. Rather, he asserts his belief that one of his subordinates, Debbie Goens, refused to follow his leadership and instruction because of his race. While Defendants knew that tension existed between Plaintiff and Goens, Plaintiff did not indicate during his grievance process or at any other time during his employment that this tension had any sort of racial component. Rather, the first indication provided to OTC officials regarding any sort of racial animus stemmed from Plaintiff's EEOC complaint. As such, Plaintiff's unsupported accusation amounts to nothing more than speculation and conjecture. *Palesch v. Missouri Com'n on Human Rights*, 233 F.3d 560 (8th Cir 2000).

Plaintiff further asserts that the explanations offered by OTC for his termination have shifted over time and are therefore indicative of pretext. *Young v. Wrner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1023 (8th Cir. 1998). The undisputed evidence shows the reasons for Plaintiff termination have not shifted. Rather, as the process of critically evaluating Plaintiff's job performance developed from February 20, 2006 until his termination, the reasons for terminating Plaintiff increased.

The memorandum of February 20, 2006 insisted that Plaintiff improve his professionalism, stop arguing with his supervisors regarding their requests, cease confrontational behavior, and keep the program current with its needs. Dr. Robertson informed Plaintiff that he needed to make business calls. The memorandum of March 2, 2006 set out concerns regarding staff morale, Craft's confrontational style, and his excessive delegation of work. The memorandum also made clear that Craft was required to make business calls and that responsibly for all monthly and quarterly statistical reporting rested with him. Further, Plaintiff's March 9, 2006 meeting with Dr. Robertson emphasized conducting business calls, assisting the Career Pathway's staff, and meeting ADHE reporting requirements. Finally, in Dr. Robertson's April 5, 2006 letter to Dr. Ballard and in Dr. Robertson's termination letter to Plaintiff, Dr. Robertson noted continued problems with Plaintiff's management and issues

15

related to ADHE reporting requirements. These reasons were restated in Dr. Robertson's April 27, 2006 letter to Dr. Ballard. As an example, Dr. Robertson noted Plaintiff's failure to make business calls. Elaboration on the reasons for terminating an individual, while maintaining the original explanation, is not indicative of pretext. *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 835 (8th Cir. 2002); *See also*, *Kobrin v. University of Minnesota*, 34 F.3d 698, 703 (8th Cir. 1994) (stating that *substantial* changes in the proffered reason preclude summary judgment).

Finally, the undisputed evidence demonstrates that the same individuals with responsibility for hiring Plaintiff made the decision to terminate his employment. The key actors in both the hiring and termination were Dr. Ballard, Dr. Robertson, and the OTC Board of Trustees. "[W]here the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action." *Richardson v. Sugg*, 325 F. Supp. 2d 919, 924 (E.D. Ark. 2004). Only eight months passed between the initiation and termination of Plaintiff's employment at OTC. The strong inference against discrimination coupled with the absence of any indication of pretext on the part of the Defendants leads the Court to grant summary judgment

16

on Plaintiff's racial discrimination claim.

### B. Retaliation

To establish a prima facie case of retaliation under Title VII or 42 U.S.C § 1983, Plaintiff must demonstrate that: "(1) he engaged in protected conduct by either opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct." *Singletary v. Missouri Dept. of Corrections*, 423 F.3d 886, 892 (8th Cir. 2005); *King v. Hardesty*, 517 F.3d 1049, 1064 (8th Cir. 2008).

The undisputed evidence demonstrates that Plaintiff filed his grievance of February 23, 2006 as a result of his meeting with Dr. Robertson on February 20, 2006 during which Dr. Robertson reprimanded Plaintiff for his poor job performance. In particular, Craft admitted that he filed the grievance because the OTC Human Resources Administrator——Rhonda Smith——was present at the meeting, thereby making the memorandum disciplinary in nature. The grievance provides absolutely no indication that it was filed because of any sort of racial animus by anyone at OTC. There is no indication that race played a role in either the grievance process or in Plaintiff's termination. "An employee must show that the employer had actual or constructive knowledge of the protected activity in

17

order to establish unlawful retaliation." *Hervey v. County of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008). Indeed, the first indication of a racial component to Plaintiff's termination came from his allegation in his EEOC complaint. "[P]ost-hoc complaints [do] not without more raise a retaliation bar to the proposed discipline because the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." *Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046, 1051 (8th Cir. 2007) (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 738 (8th Cir. 2004)). Accordingly, the grievance did not constitute an act of opposing or investigating an act of discrimination made unlawful under Title VII. Therefore, Defendants are entitled to summary judgment on the Plaintiff's retaliation claim.

**IV. Conclusion**

For the previously stated reasons, Defendants' Motion for Summary Judgment is GRANTED. Plaintiff's racial discrimination and retaliation claims are DISMISSED WITH PREJUDICE. Each party is to bear its own fees and costs associated with this case.

IT IS SO ORDERED this 21st day of October, 2008.

*/s/ Robert T. Dawson*
Honorable Robert T. Dawson
United States District Judge